IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 80434-1-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| SCOTT THEODORE JOHNSON, | |
| Appellant. | |

BOWMAN, J. — A jury convicted Scott Theodore Johnson of three counts of unlawful delivery of methamphetamine and one count of bail jumping. Seeking reversal,[1] Johnson claims the court erred in admitting hearsay and violated his right to confrontation. He also argues the court wrongly imposed legal financial obligations (LFOs). We affirm the convictions but remand to correct the LFOs.

FACTS

On June 27, 2014, Whatcom County Jail inmate James Gamble wrote a "kite"[2] to jail staff, stating:

I want to talk about my charges. I have good information on a person that moves a lot of meth[3] and simple heroin. I can always,

---

[1] The bail jumping conviction is not at issue in this appeal.

[2] A "kite" is a form used by inmates to communicate with jail or prison staff.

[3] Methamphetamine.

if needed, get anything I want and want to cooperate and maybe
work out an agreement with [the Whatcom County drug] task force.

In response to this message, Sergeant Magnus Gervol of the Whatcom County Sheriff's Office Gang and Drug Task Force and an agent from the Northwest Regional Gang-Drug Task Force (collectively the Task Force) met Gamble and contracted with him to serve as a confidential informant.

On July 16, 2014, Sergeant Gervol met with Gamble to "ascertain information from him related to subjects distributing illegal drugs in Whatcom County." During the meeting, Gamble tried to call someone named "Scotty" but no one answered. Sergeant Gervol searched his law enforcement database and found the telephone number Gamble called "match[ed] up to" a "subject named Scott Theodore Johnson."

The next day, Sergeant Gervol again met Gamble to arrange a controlled buy with Johnson. With Sergeant Gervol listening in on a "tipped" call,[4] Gamble phoned Johnson and arranged to buy a gram of "crystal"[5] for $200. Johnson and Gamble agreed to meet at a location in Bellingham later that day. The Task Force gave Gamble cash for the buy. With the Task Force agents watching, Johnson sold Gamble two "small little bags" of methamphetamine.

On July 25, 2014, Gamble arranged a "second buy" with Johnson. The first call between Gamble and Johnson that morning was not a tipped call, but another call that afternoon was. During the second tipped call, Sergeant Gervol

---

[4] According to Sergeant Gervol, a "tipped phone call" is "where the informant could place a call to the suspect or the suspect could call the informant in an officer's presence and we could hear the conversation as they are discussing it."

[5] "Crystal" is slang for methamphetamine.

overheard Johnson offer Gamble "a G[6] of crystal" for $140 and tell Gamble to meet him at his Bellingham residence for the exchange.[7]  Before the scheduled exchange, Sergeant Gervol drove to Johnson's residence to conduct "preoperational surveillance of the location" and saw Johnson in front of his home.  Sergeant Gervol "had seen a Department of Licensing photograph" of Johnson and recognized Johnson from the first controlled buy.

The Task Force equipped Gamble with a "wire" recording device, gave him "the prerecorded buy funds," and told him to go to the buy location.  Members of the Task Force had set up surveillance at Johnson's residence, and Sergeant Gervol "had a clear unobstructed view of [Johnson] as [he] did earlier in the day."  Once Gamble arrived at the residence, however, Johnson drove Gamble to a second location—a motor home—to complete the purchase of a gram of methamphetamine.  After the transaction, Sergeant Gervol secured the audio recordings from the wire Gamble was wearing.

On September 11, 2014, in a third controlled buy lasting about two minutes, Gamble bought an eighth of an ounce of methamphetamine from Johnson for $200.  The Task Force videotaped the transaction and Gamble again wore a wire.

The State charged Johnson with delivery of a controlled substance, methamphetamine, "on or about" July 14, 2014 (count I); July 25, 2014 (count II);

---

[6] Gram.

[7] Sergeant Gervol recognized Johnson's voice as "the same voice that I heard . . . during the first tipped call" on July 17.

and September 11, 2014 (count III).[8]  The State later amended the information to add an aggravator to each count that the offenses were major violations of the Uniform Controlled Substances Act (VUCSA), chapter 69.50 RCW, and to correct the offense date in count I to July 17, 2014.

Before trial, Johnson moved to preclude law enforcement officers from testifying about "their opinions and level of knowledge" of events if such testimony stemmed from hearsay.  Johnson also moved to exclude Gamble's out-of-court statements on confrontation clause grounds if Gamble did not testify. The court reserved ruling on the hearsay motions in limine:

> So I think what I'll do is the most clear way, and this happens very frequently in these kinds of motions, part of the problem is to take a blanket ruling regarding individualized pieces of evidence.  I don't think I can do that.  What I can say is hearsay is generally not admissible and proffered, et al, required a right, the court recognizes the right to confrontation.  So, I think what we'll have to do is, you know, [defense counsel], you might need to be sharp about when to object and if we need to take the jury out to consider a particular statement or piece of evidence, we can do that.
> I'll just say that my ruling is hearsay is generally [in]admissible.  A defendant has a right to confront witnesses against him and we'll have to do an individualized analysis for the pieces of evidence or testimony that you want to challenge.

The case proceeded to jury trial in July 2019.  Sergeant Gervol was the State's primary witness.  Sergeant Gervol testified about the Task Force, acquiring and "handling" a confidential informant, how to arrange controlled buys, definitions of often-used "coded language" or "drug slang," methods for investigating an informant's information, and his work with Gamble to purchase methamphetamine from Johnson.  He identified Johnson in the courtroom.

---

[8] The State amended the information on June 4, 2015 to add bail jumping (count IV).

4

Sergeant Gervol also described the events captured by the wires Gamble wore as the State played the audio recordings for the jury.

Several other law enforcement officers also testified. United States Customs and Border Protection Agent Jorge Carrasco testified to being part of the surveillance team for the Task Force for all three controlled buys. Agent Carrasco video recorded the third controlled buy, authenticated and narrated the recording as it played for the jury, and identified Johnson and Gamble in the video. United States Department of Homeland Security Investigations Special Agent Thomas Lecompte testified that he was one of confidential informant Gamble's "handlers" and participated in the controlled buys with Johnson. Whatcom County Sheriff's Detective Matthew High testified that Gamble signed a confidential informant contract with the Task Force in 2013. But no controlled purchases ever resulted and the 2013 contract "expired."

Tiffany Mulryan dated Johnson for "two or three months" in 2014 and "hung out with [Gamble] probably five times." She testified that she recognized Johnson's and Gamble's voices on the audio recording excerpts the State played in court.[9]

Gamble did not testify at trial. Only Johnson testified in his defense. But Johnson testified about only the bail jumping charge, not the unlawful delivery charges. The jury found Johnson guilty as charged.

---

[9] The transcript does not identify the exhibits the State used to play the audio excerpts.

At sentencing, the court imposed a standard-range sentence. The court awarded $540 in restitution to the Task Force. It imposed a $100 DNA[10] collection fee and a $500 crime victim fund assessment. And, without inquiring into Johnson's ability to pay, the court imposed a $200 criminal filing fee, a $250 jury demand fee, a $1,000 VUCSA fee, a $1,000 drug enforcement fund fee, and a $100 crime lab fee. The court also imposed interest on the LFOs in the judgment and sentence.

Johnson appeals.

## ANALYSIS

Johnson seeks reversal, arguing the trial court erred by admitting hearsay statements and violating his right to confrontation. He also challenges the court's imposition of LFOs.

Hearsay

Johnson contends the court erred in allowing Sergeant Gervol to testify about statements made by Gamble.

"Hearsay" is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Unless an exception applies, hearsay is inadmissible. ER 802; State v. Athan, 160 Wn.2d 354, 382, 158 P.3d 27 (2007). A statement offered for a purpose other than its truth is not hearsay and is admissible. State v. Iverson, 126 Wn. App. 329, 336-37, 108 P.3d 799 (2005).

---

[10] Deoxyribonucleic acid.

Whether a statement is hearsay is a question of law that we review de novo. State v. Edwards, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). We review a court's determination that a hearsay exception applies for an abuse of discretion. State v. Magers, 164 Wn.2d 174, 187, 189 P.3d 126 (2008). Abuse of discretion occurs when a court's decision is manifestly unreasonable or based on untenable grounds. State v. Bradford, 175 Wn. App. 912, 927, 308 P.3d 736 (2013).

Johnson claims the court erred in allowing these seven hearsay statements by Sergeant Gervol at trial: (1) Gamble had "good information on a person that moves a lot of meth and simple heroin," (2) Gamble was trying to contact an "individual named Scotty," (3) Gamble could purchase a gram of methamphetamine from Johnson for $200 in the first controlled buy, (4) Gamble could buy a gram of methamphetamine from Johnson for $140 in the second controlled buy, (5) Gamble said that "the deal had occurred" during the second buy, (6) Gamble reported that Johnson "was still selling methamphetamine" before the third controlled buy, and (7) Gamble could buy an eighth of an ounce of methamphetamine from Johnson for $200 in the third buy. With two exceptions, Johnson did not object to any of the testimony he now argues the court erroneously admitted. Absent an objection, Johnson did not preserve those alleged evidentiary errors for our review. See RAP 2.5(a); State v. Smith, 155

Wn.2d 496, 501, 120 P.3d 559 (2005); State v. Powell, 126 Wn.2d 244, 256, 893 P.2d 615 (1995).[11]

Relying on Powell, Johnson argues that his motions in limine preserved this issue. His reliance is misplaced. The Powell court held that a party does not preserve for appeal their objections to evidence made in a motion in limine if " 'the trial court indicates that further objections at trial are required when making its ruling.' " Powell, 126 Wn.2d at 256 (quoting State v. Koloske, 100 Wn.2d 889, 895, 676 P.2d 456 (1984), overruled on other grounds by State v. Brown, 111 Wn.2d 124, 761 P.2d 588 (1988)). Here, the court specifically told counsel that "you might need to be sharp about when to object and if we need to take the jury out to consider a particular statement or piece of evidence, we can do that"; and that "we'll have to do an individualized analysis for the pieces of evidence or testimony that you want to challenge." Thus, we decline to review for error the testimony of Sergeant Gervol that Johnson did not object to at trial.

We turn to address the two hearsay objections Johnson made at trial,[12] beginning with Sergeant Gervol's testimony about arranging the second controlled buy on July 25, 2014:

> Q. And how was that buy set up?
> A. It was arranged for the informant to meet with Mr. Johnson in person at 3007 Cowgill Lane in Bellingham, Whatcom

---

[11] "A party cannot appeal a ruling admitting evidence unless the party makes a timely and specific objection to the admission of the evidence." State v. Avendano-Lopez, 79 Wn. App. 706, 710, 904 P.2d 324 (1995) (citing ER 103). "These rules are intended 'to afford the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials.' " Avendano-Lopez, 79 Wn. App. at 710 (citing ER 103; RAP 2.5(a)) (quoting Smith v. Shannon, 100 Wn.2d 26, 37, 666 P.2d 351 (1983)).

[12] Our review of the record shows other occasions when Johnson objected to testimony on hearsay grounds, but he did not assign error to them, so those evidentiary rulings are not before us. RAP 10.3(a)(4).

> County, Washington, to purchase the controlled substance.
>
> Q. And was that arrangement made by phone?
>
> A. I'm going to reflect on my report. Yes, it was.
>
> Q. Okay. Do you recall what time of the day it was that that phone call was made?
>
> A. It was made in the early afternoon or, excuse me, it was in the late, late morning around 10 a.m.
>
> Q. Okay. That was an initial phone call the CI [(confidential informant)] had made to Mr. Johnson, correct?
>
> A. Correct.
>
> Q. Um, so based on that initial phone call, were you given information as to how much was going to be sold?
>
> A. Yes.
>
> Q. How much?
>
> A. It was a gram of methamphetamine for —
>
> [DEFENSE COUNSEL]: Objection, Your Honor, hearsay.
>
> THE COURT: [Prosecutor].
>
> [PROSECUTOR]: It's not offered for the truth. Your Honor, if you are given information as to an amount and a dollar amount is not offered for the truth.
>
> THE COURT: I think he can reflect about his understanding of the circumstances, [defense counsel], so I will overrule the objection.
>
> Q. (BY [PROSECUTOR]) So you indicated a gram for how much?
>
> A. Approximately $140. The original conversation between Mr. Gamble and the suspect was not a tipped call. It was later on in the afternoon that I was present when another call was made and that was a tipped call. I could overhear between suspect and Mr. Gamble, our confidential informant.

Sergeant Gervol's testimony was hearsay. And we do not find compelling the State's argument that it offered the testimony only to show what the officer did to arrange the controlled buy. But the erroneous admission of hearsay is harmless unless, within reasonable probability, the improper evidence affected the outcome of the trial. State v. Thomas, 150 Wn.2d 821, 871, 83 P.3d 970 (2004). Here, moments after the above exchange, Sergeant Gervol testified that

9

he heard the same information directly from Johnson:

> Q. And during that [afternoon] tipped phone call that Mr. Gamble was making, did you have occasion to listen to the voice on the other end of that phone?
> A. Yes, I did.
> Q. Did you recognize it?
> A. Yes. It was the same voice that I heard on July 17th of 2014 during the first tipped call, it was the same voice, and, ah, an offered agreement was made for the informant to purchase a G of crystal for approximately $140.

Johnson did not object to this testimony, which was admissible as an admission by a party opponent. See ER 801(d)(2).[13] Based on Sergeant Gervol's later testimony, we conclude the outcome at trial would not have been different absent the officer's earlier, challenged testimony.

Next, after the State played for the jury portions of the audio recordings of the second controlled buy, without objection, the State asked Sergeant Gervol to describe the audio for the jury:

> Q. . . . Sergeant Gervol, do you recognize what's happening there?
> A. Yes.
> Q. What happened?
> A. T[ ]o work in the art of deception and that was me calling the informant to determine his safety and what had changed and why things were progressing as long as they were and, um, the original location at 3007 Cowgill during this original meeting for the second meeting but the meeting that day resulted in them having to depart that location and drive to another address in Bellingham. Reflecting at my notes, um, near the intersection of MacKenzie, east of 24th Street, where they, Mr. Johnson got out of the vehicle, surveillance followed him over there and then returned to the vehicle and then they departed and left to the AM/PM [store], so the confidential informant was giving me information about some of the vehicles that were there and some of the people that

---

[13] "A statement is not hearsay if . . . [t]he statement is offered against a party and is (i) the party's own statement." ER 801(d)(2).

10

> he could see closer up and that the deal had occurred and that he was waiting to be —
>
> [DEFENSE COUNSEL]: Objection, Your Honor, that's hearsay.
>
> THE COURT: [Prosecutor].
>
> [PROSECUTOR]: Well, once again, it's descriptive and it's not being offered for the truth. I don't know what kind of deal, you know, that he is referring to. But I think it's just, he is just indicating what's happening during this period of time.
>
> THE COURT: I think it's explanatory and foundational for his describing the circumstances so I'll overrule the objection. Thank you.
>
> Q. (BY [PROSECUTOR]) Were you finished with your answer?
>
> A. So that was the — in summation, the phone call that you heard was between me and the informant.

Here, Gamble's out-of-court statements were hearsay. But the State played the statements for the jury from an audio recording already admitted as evidence. Sergeant Gervol's testimony giving context to statements already admitted as evidence was not hearsay.

Right to Confrontation

Johnson argues the admission of Gamble's out-of-court statements violated his right to confrontation.[14] But he did not raise this objection at trial. Because he failed to do so, Johnson waived his challenge on appeal. State v. O'Cain, 169 Wn. App. 228, 248, 279 P.3d 926 (2012) (holding that "a defendant [must] raise a Sixth Amendment confrontation clause claim at or before trial or lose the benefit of the right"); Powell, 126 Wn.2d at 256 (evidentiary rulings made

---

[14] The confrontation clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI; see WASH. CONST. art. I, § 22. It bars the admission of "testimonial" hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The State has the burden of establishing that statements are nontestimonial. State v. Koslowski, 166 Wn.2d 409, 417 n.3, 209 P.3d 479 (2009).

pursuant to motions in limine are not preserved for appeal if they are not "final rulings" and the court requires further objections be made at trial). Therefore, we decline to consider this issue.

Legal Financial Obligations

Johnson challenges the imposition of LFOs. We review the court's imposition of LFOs for an abuse of discretion. State v. Ramirez, 191 Wn.2d 732, 741, 426 P.3d 714 (2018).

> If the trial court fails to conduct an individualized inquiry into the defendant's financial circumstances, as RCW 10.01.160(3)[15] requires, and nonetheless imposes discretionary LFOs on the defendant, the trial court has per se abused its discretionary power.

Ramirez, 191 Wn.2d at 741.

I. Discretionary LFOs and Interest Accrual Provision

Here, the court did not inquire on the record about Johnson's current or future ability to pay LFOs. But after entering the judgment and sentence, the court granted Johnson's motion for an order allowing him to seek review at public expense and appointing an attorney.[16] We agree with Johnson that the court must strike from his judgment and sentence all discretionary LFOs as well as the interest accrual provision. We remand for the court to strike the criminal filing fee ($200), jury demand fee ($250), drug enforcement fund fee ($1,000), VUCSA fine

---

[15] RCW 10.01.160(3) provides, in part, "The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent."

[16] Johnson submitted a declaration with his motion stating, "I have previously been found to be indigent" and providing "information as to my current financial status."

($1,000), and crime lab fee ($100).[17]  We also remand to strike the interest accrual provision because "[a]s of June 7, 2018, no interest shall accrue on nonrestitution" LFOs.  RCW 10.82.090(1); Ramirez, 191 Wn.2d at 747.

### II.  DNA Collection Fee

Johnson argues the court erred in imposing a $100 DNA collection fee because the State did not prove that a state agency did not previously collect his DNA in a prior felony conviction.  The State responds that the court confirmed it had not previously ordered the state to collect Johnson's DNA by reviewing an electronic version of a prior judgment and sentence.  Because the document reviewed by the court is not in the record, we cannot determine whether the court abused its discretion.

We remand for the court to determine whether a court previously ordered Johnson to pay the DNA collection fee.  On remand, the State must show whether Johnson actually provided a DNA sample and if so, the court must strike the DNA collection fee from the judgment and sentence.  RCW 43.43.7541 (a DNA collection fee is mandatory "unless the state has previously collected the offender's DNA as a result of a prior conviction").

---

[17] See RCW 36.18.020(2)(h) (the criminal filing fee "shall not be imposed on a defendant who is indigent"); RCW 10.46.190 (the jury demand fee "shall not" be ordered if the person is indigent at the time of trial); State v. Hunter, 102 Wn. App. 630, 634-35, 9 P.3d 872 (2000) (characterizing imposition of fee for county or interlocal drug funds as discretionary); RCW 69.50.430(1) (the VUCSA fine may be waived based on indigence); RCW 43.43.690(1) (the crime lab fee may be suspended if "the person does not have the ability to pay the fee").

III. Restitution

Johnson contends the court erred in requiring him to pay $540[18] in restitution to the Task Force, arguing that the Task Force is not a "victim" under RCW 9.94A.753(3) or (5). Without citation to authority, the State argues that the Task Force lost their property during the three controlled buys and Johnson "[s]imply" needs "to give the Task Force its money back."

> [R]estitution ordered by a court pursuant to a criminal conviction shall be based on easily ascertainable damages for injury to or loss of property, actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury.

RCW 9.94A.753(3).[19] "There must be a causal connection between the damages claimed and the crime charged." State v. Tobin, 161 Wn.2d 517, 527, 166 P.3d 1167 (2007). The court may award restitution only to "victims." State v. Kinneman, 122 Wn. App. 850, 866, 95 P.3d 1277 (2004). An entity such as the Task Force is a "victim" if the defendant's offense either (1) directly victimized it or (2) caused the entity to incur expenses to assist others[20] directly victimized by the offense. State v. Cawyer, 182 Wn. App. 610, 617, 330 P.3d 219 (2014).

Here, because Johnson's crime did not directly victimize the Task Force or cause it to incur expenses to assist persons directly victimized by the offense, we

---

[18] The Task Force gave Gamble $200, $140, and $200 for the three controlled buys with Johnson.

[19] RCW 9.94A.753(5) provides, in pertinent part, that "[r]estitution shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property."

[20] RCW 9.94A.030(54) defines "victim" as "any person who has sustained emotional, psychological, physical, or financial injury to person or property as a direct result of the crime charged."

conclude the Task Force was not a "victim" entitled to restitution in this case. We remand to strike the restitution obligation.

IV. Mandatory LFOs

The sole remaining LFO, a $500 crime victim fund assessment, is a mandatory fine that the court must impose regardless of Johnson's indigency. RCW 7.68.035(1)(a); State v. Catling, 193 Wn.2d 252, 259-60, 438 P.3d 1174 (2019). We affirm this LFO.

In sum, we affirm Johnson's convictions but remand for modification of the LFOs consistent with this opinion.

Bowman, J.

WE CONCUR:

Coburn, J.                    Chun, J.