[No. 52951-0-I. Division One. February 7, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID J. IVERSON, *Appellant*.

---

[19] *Ross*, 152 Wn.2d at 231.

*Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant.

*Janice E. Ellis, Prosecuting Attorney*, and *Mary K. Webber, Deputy*, for respondent.

¶1 KENNEDY, J. — David J. Iverson appeals his conviction for felony violation of a protection order, claiming that the trial court improperly admitted hearsay evidence to prove the identity of the victim (who did not testify at the trial)

and thus the corpus delicti of the crime was not established preliminary to the admission of Iverson's confession. The trial court did not rely upon the victim's self-identification to police to prove the identity of the victim. The officers, who were Everett police rather than jail employees or sheriff's deputies, were qualified to testify regarding the identity and mode of preparation of jail booking records, that such records are made in the regular course of business when persons are booked into jail, and that such records are routinely relied upon by police for identification of persons who have been booked into the jail. Thus, the victim's prior jail booking records, which contained her name, address, physical description, and booking photos, were properly admitted as business records under RCW 5.45.020, and the court did not err in relying on the records, paired with officer testimony regarding the victim, to hold that the victim was indeed the person identified in the protection order. The corpus delicti was thereby established, and as a result, the court properly admitted Iverson's incriminating statements to police. Thus, we affirm the judgment and sentence.

## FACTS

¶2 On May 27, 2003, the Everett Municipal Court issued a protection order directing David Iverson to have no contact with his former girlfriend, Cara Nichols, or to enter or remain within 150-feet of her residence. This order was valid for two years. On June 14, 2003, Everett Police Officers Robert Cracchiolo and Wayne Boudreau were dispatched to an apartment to investigate a trespass report. Based on additional information received in the dispatch, Officer Cracchiolo requested a search for protection orders related to the caller and discovered that a protection order had been issued for Cara Nichols against David Iverson. When the officers arrived at the address, a woman answered the door. Upon inquiry by Officer Cracchiolo, the woman said that she was Cara Nichols. She subsequently filled out an information form that permitted the officers to

conclude that she was the person named in the protection order.

¶3 The officers entered the residence and called Iverson's name. Iverson did not immediately respond, but the officers subsequently discovered him hiding in a back bedroom, and placed him under arrest for violation of the protection order. In the police car, Iverson made this spontaneous statement: "Man I am going to prison for a year and a day. They told me if I did it again I was going to prison."

¶4 At the police station, Iverson was read his rights and then gave a handwritten statement in which he admitted to entering the apartment knowing that Ms. Nichols was there in violation of the protection order. Iverson was charged with felony violation of a protection order based on two prior violations of such an order in violation of RCW 26.50.110. Iverson waived his right to a jury, and a bench trial was held.

¶5 Cara Nichols did not appear at the trial. Iverson objected to officer testimony regarding the identity of the person who answered the apartment door. The court ruled that the statement was admitted only to show that the person identified herself as Cara Nichols, but that it was not admitted to show that she was, in fact, Cara Nichols. The defense opined that the State would not be able to prove the corpus delicti of the crime because officer testimony could not be used to prove the identity of the woman at the apartment. The court granted the State a recess until after lunch to attempt to locate Ms. Nichols.

¶6 When court resumed, Ms. Nichols still was not present. Officer Cracchiolo testified that during the recess he had obtained Cara Nichols' arrest records from COTS, the computer system "used in the jail facility for photographing and keeping information about the inmate population." 1 Report of Proceedings at 29. Although Officer Cracchiolo did not know what the acronym COTS stood for, he testified that the system was relied on by police officers to identify particular individuals and by investigators to get

accurate photographs of individuals who have been booked into jail custody on prior occasions.

¶7 Iverson objected to the testimony, asserting that Officer Cracchiolo was not a custodian of the records, was not qualified to answer questions about the COTS system, did not work for Snohomish County Jail where the records were created, and thus Cara Nichols' arrest records—which were not certified copies—were not admissible as business or public records. Without making a final ruling with respect to the business record exception to the hearsay rule, the court allowed the officer to continue testifying.

¶8 Officer Cracchiolo testified that the COTS system was something that he and other officers relied upon in taking photographs when suspects are arrested and booked into county jail, and that he in fact used the system when he booked Iverson into jail. Officer Cracchiolo stated that he found four arrest records for Cara Nichols, and that each one had the same date of birth as the one associated with all the booking photos. These dates also matched the date of birth on the written statement given by the person who identified herself to police as Cara Nichols on the date of Iverson's arrest. Officer Cracchiolo testified that he recognized the person depicted in the four booking photographs to be the same person who identified herself as Cara Nichols on the day of Iverson's arrest. On cross-examination, Officer Cracchiolo acknowledged that although he used the computer system when he booked people into jail, he had no control over how Snohomish County Jail compiles booking data, no control over the accuracy of the information that is put into the computer by others, and no control over how the documents are collected and stored.

¶9 Still without making a final ruling, the court heard Officer Boudreau's testimony. That officer testified that during arrest and booking of a suspect, the suspect's photograph is taken and entered into the county's computer records. Officer Boudreau stated that the photographs in the computer system are later used to obtain accurate photographs of previously booked individuals. He stated

that although people being booked sometimes lie about their identities, in his own experience using the system, booking photographs had always matched the individuals for whom they were listed. Officer Boudreau testified that the person in the booking photographs that was identified as Cara Nichols was the same person who identified herself as Cara Nichols at the residence where Iverson was located and arrested. Officer Boudreau stated that he had also seen that same woman at that same residence prior to the day of Iverson's arrest, although he had not been told her name prior to that day.

¶10 The court ultimately admitted the jail records, ruling there was "sufficient evidence of their authenticity and reliability to allow them to be admitted." 1 Report of Proceedings at 58-59; *see* Exs. 4-6. Accordingly, the court admitted into evidence and considered the officers' identification of the person who was at the residence as the same person depicted in the mug shots. And upon admitting this evidence, the court also admitted the evidence regarding Iverson's incriminating statements.

¶11 After hearing closing arguments, the court found that the woman who had been at the residence when Iverson was arrested was in fact Cara Nichols, the same person named in the protection order, and based on all the evidence that the court had admitted, found Iverson guilty as charged.

¶12 Iverson was sentenced to a standard range sentence of nine months of incarceration, and he appeals.

## DISCUSSION

¶13 Iverson was charged with felony violation of a protection order based on two prior violations of such an order in violation of RCW 26.50.110.[1] Although Iverson

---

[1] RCW 26.50.110(5) provides "[a] violation of a court order issued under this chapter, chapter 10.99, 26.09, 26.10, 26.26, or 74.34 RCW, or of a valid foreign protection order as defined in RCW 26.52.020, is a class C felony if the offender has at least two previous convictions for violating the provisions of an order issued

confessed to the crime, the court could not consider the confession unless there existed prima facie evidence, independent of the confession, of the corpus delicti of the crime. *State v. Ray*, 130 Wn.2d 673, 679, 926 P.2d 904 (1996). Iverson argues on appeal that the court had no basis for admitting his confession because the evidence upon which it relied to prove the identity of Cara Nichols was improperly admitted.

■ ¶14 The decision whether to admit or refuse evidence is within the discretion of the trial court and will not be reversed absent a manifest abuse of discretion. *State v. Stubsjoen*, 48 Wn. App. 139, 147, 738 P.2d 306 (1987) (discussing trial court's exclusion of hearsay statements that did not conform to a recognized exception of the hearsay rule).

¶15 Iverson first argues that the only purpose for admission of Ms. Nichols' self-identification was for the truth of what she said; thus, he argues, the statement was hearsay and erroneously admitted. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Generally, hearsay is not admissible except as provided by various exceptions in the Washington Rules of Evidence. ER 802.

■■ ¶16 Had the court admitted the statements from the woman who answered the door, and who did not testify at trial, for the purposes of identifying her and proving the truth of the matter asserted, the statement would have been hearsay. The trial court recognized this to be true and expressed that understanding on the record, both at the time of the ruling and in the written findings of fact. Thus, the statement clearly was not admitted to prove the truth of the matter and was not hearsay.

---

under this chapter, chapter 10.99, 26.09, 26.10, 26.26, or 74.34 RCW, or a valid foreign protection order as defined in RCW 26.52.020. The previous convictions may involve the same victim or other victims specifically protected by the orders the offender violated."

¶17 The statement was nevertheless relevant to explain why the officers, who were by then aware of the protection order and its contents, then conducted further investigation. When a statement is not offered for the truth of the matter asserted but is offered to show why an officer conducted an investigation, it is not hearsay and is admissible. *See, e.g., State v. Williams*, 85 Wn. App. 271, 280, 932 P.2d 665 (1997) (holding that officer's statement to another that he smelled alcohol on the breath of the defendant was not offered to prove the truth of the matter, but to show why the officer then requested the defendant to perform a Breathalyzer test, and was not inadmissible hearsay). Thus, the court did not err in admitting the woman's self-identification for the limited purpose of showing that she did so and to help explain the officers' subsequent investigation. Iverson's arguments to the contrary are frivolous.

 ¶18 Iverson next asserts that Cara Nichols' booking records were admitted without a valid basis under the business records exception to the hearsay rule. Records of a regularly conducted activity are an exception to the general hearsay rule. ER 803(a)(6). Admission of these records is governed by RCW 5.45.020, which provides:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

Admission of business records pursuant to the business records exception does not violate a defendant's right to confrontation. *State v. Monson*, 113 Wn.2d 833, 841-43, 784 P.2d 485 (1989) (discussing *State v. Kreck*, 86 Wn.2d 112, 542 P.2d 782 (1975)).

██ ¶19 RCW 5.45.020 does not require examination of the person who actually made the record. *Cantrill v. Am. Mail Line, Ltd.*, 42 Wn.2d 590, 607-08, 257 P.2d 179 (1953)

(discussing admission of medical records under RCW 5.45.020 through persons who did not create the records). Testimony by one who has custody of the record as a regular part of his work or who has supervision of its creation will be sufficient to properly introduce the record. *Cantrill*, 42 Wn.2d at 608. *See also State v. Garrett*, 76 Wn. App. 719, 723-25, 887 P.2d 488 (1995) (medical records properly admitted through treating physician who routinely relied on records prepared by her fellow physicians in the ordinary course of business in treating her patients). Further, where "the trial court is satisfied that sufficient testimony has been adduced regarding the manner in which certain records have been kept, and that their identity has been properly established in compliance with the act, no objection on the ground of hearsay can be entertained." *Cantrill*, 42 Wn.2d at 607-08.

¶20 Iverson questions the admission of Ms. Nichols' booking records through the testimony of Officers Cracchiolo and Boudreau because the officers did not work for the Snohomish County Jail where the records were produced, at least one of them did not know what the COTS acronym stood for, neither of them was in charge of the of the records or how they were entered or kept, and although both had utilized the system when booking prisoners, neither had control over the accuracy of the information provided by others. Iverson claims that this situation is no different from that presented in *State v. Weeks*, 70 Wn.2d 951, 425 P.2d 885 (1967). We disagree.

¶21 In *Weeks*, the Washington Supreme Court affirmed the trial court's refusal to admit medical records through the testimony of the defendant's psychiatrist, who had received the records from an Arkansas medical facility. The *Weeks* court ruled that the record was not admissible in that it had not been made by the defendant's physician or his office in his regular course of business to treat one of his patients, and thus he was not an "other qualified witness" as defined by RCW 5.45.020 who could testify as to the record's contents and mode of preparation. *Weeks*, 70 Wn.2d

at 953-54. Here, unlike the psychiatrist in *Weeks*, the officers were persons who enter data and pictures into a jail computer system in the regular course of their business as police officers and who also routinely rely upon such data provided by other officers in the regular course of business.

¶22 We believe this situation is more like that presented in *Garrett*, 76 Wn. App. 719. In *Garrett*, the child victim had been examined by an emergency room physician and a medical social worker, both of whom made entries in the child's medical records. The child's treating physician was permitted to testify regarding the contents of the medical records that were prepared by these other medical workers. The *Garrett* court ruled that because the physician routinely relied on records prepared by her fellow physicians in the ordinary course of business in treating her patients, she was a qualified witness under the business records exception to the hearsay rule. *Garrett*, 76 Wn. App. at 723-25.

¶23 While the officers here did not actually enter Ms. Nichols' booking information into the jail's computer system, they were familiar with the booking system and used it to enter data and pictures of other persons booked into jail in their regular course of business. They also routinely relied on the information prepared by fellow officers in their ordinary course of business to identify persons who previously had been booked into jail. Under the reasoning of *Garrett*, the officers were qualified witnesses to identify the records—which in turn were competent evidence of the contents of the records—in this case, photographs and other identifying information regarding Cara Nichols. The officers thus were entitled to testify that the person depicted in the booking photos was the same woman who answered the door at the residence on the day of Iverson's arrest and that the identifying information she provided at that time matched the information in the booking records and in the protection order itself.

■ ■ ¶24 We also observe that jail booking records, when certified, are the kinds of records that are automatically admissible under RCW 5.44.040, the public records

statute. *See State v. Hines*, 87 Wn. App. 98, 101, 941 P.2d 9 (1997) (jail record at issue was a routine booking sheet that included, among other routine information, the social security number, telephone number, address, height, weight— exactly the kind of record contemplated by RCW 5.44.040). Under the business record statute, the trial court must be persuaded that the sources of information, and the method and time of preparation of the record, were such as to justify its admission. RCW 5.45.020. The trial court here was entitled to consider the type of record at issue in making this determination. If the officers had thought to obtain certified copies of these booking records, they would have been admissible under the public records statute, without further ado. We see no abuse of discretion in the trial court's determination, based on the testimony of the officers, that the time and method of the preparation of these routine booking records justified their admission as business records kept in the regular course of business.

¶25 Iverson finally asserts that the information contained in Ms. Nichols' booking records regarding her identity, height, weight, and address were independently inadmissible hearsay and did not fall within one of the hearsay exceptions. But as the State points out, photographs are not oral or written assertions and are thus not hearsay statements under ER 801. *See United States v. May*, 622 F.2d 1000, 1007 (9th Cir. 1980) (citing FED. R. EVID. 801(a) which is similar to ER 801(a) and which defines "statement" as an oral or written assertion or nonverbal conduct of a person, if it is intended by the person as an assertion). Moreover, the information contained in the booking records in this case is exactly the kind of information that is routinely included in booking records everywhere in the country. Such records are considered to be reliable in part because they are so very routine. None of the cases that Iverson relies upon persuades us to the contrary.

¶26 In *State v. Christopher*, 114 Wn. App. 858, 862-64, 60 P.3d 677, *review denied*, 149 Wn.2d 1034 (2003), the defen-

dant was charged with prescription fraud. The trial court allowed admission of the defendant's medical records, which included the handwritten notations of a physician regarding a phone call from a pharmacist stating that the pharmacy had had a "fraudulent call" from someone claiming to be the physician and that the physician recommended no more narcotics for the defendant. The Court of Appeals reversed, concluding that the handwritten notation was not a record of an act, condition, or event as defined by RCW 5.45.020 but was "information received from a third party with no expertise to form a legal conclusion." *Christopher*, 114 Wn. App. at 862. This is different from the information contained in Ms. Nichols' booking records, which are routine statements regarding name, address, height, weight, and the like, based on perceptions of persons admitting her into custody or her own statements regarding routine identifying data of the exact sort that is found in virtually all booking records. *Christopher* does not establish that the information is hearsay.

¶27 In *State v. Tharp*, 26 Wn. App. 184, 186, 612 P.2d 11 (1980), the appellate court held that the trial court should have rejected a motel registration slip because there was no evidence that the information contained in the slip had been obtained from reliable sources. *Tharp*, 26 Wn. App. at 186. This is unlike the information provided here which is created on a routine basis when suspects are booked into a jail by police officers and is later generally relied upon and used to identify persons who have been booked into jail by police officers. We see no valid comparison between motel registration slips that have not been sufficiently authenticated and jail booking records that have been sufficiently authenticated.

¶28 Finally, Iverson cites *Monson*, 113 Wn.2d 833, which addressed whether a certified driving record was properly admitted under the hearsay exception provided in RCW 5.44.040 for certified records. The *Monson* court noted that other jurisdictions had concluded that admission of a de-

fendant's properly authenticated driving record under the public records exception to the hearsay rule, under statutes similar to RCW 5.45.020, does not violate a defendant's right to confrontation. *Monson*, 113 Wn.2d at 835-37, 846. *Monson* is cited by Iverson for the proposition that hearsay within a business record must be independently justified, but this case does not provide any support for his argument that the records provided in this case contained independent hearsay that should have been redacted.

¶29 In sum, finding no error, we affirm Iverson's conviction.

BAKER and BECKER, JJ., concur.